**NON-COMPETITION, NON-SOLICITATION, AND
<u>CONFIDENTIALITY AGREEMENT</u>**
**(12 Months)**

This Non-Competition, Non-Solicitation, and Confidentiality Agreement ("Agreement") is made by and between: (1) the individual who signs below ("Employee"); and (2) Hub Group, Inc., and any entity that controls, is controlled by, or is under common control with Hub Group, Inc., including, without limitation, its subsidiaries, affiliates, successors, and assigns (collectively, "Hub").

In consideration for Employee's employment and continued employment by Hub and certain monies, benefits, options, restricted stock, bonus eligibility, incentive compensation, career opportunities, and/or access and/or continued access to Confidential Information and Protected Contacts to which Employee would not have access and/or continued access but for Employee's employment by Hub in exchange for this Agreement and which Employee acknowledges are of significant benefit to Employee, and for other good and valuable consideration, the receipt and sufficiency of which are hereby mutually acknowledged, Employee and Hub agree as follows:

1.      **Definitions**.  The following terms have the following meanings in this Agreement:

(a)      "Confidential Information" means information relating to the present or planned business of Hub that has not been released publicly by authorized representatives of Hub. Confidential Information includes Hub's trade secrets as defined under federal and state law, inventions, and any other information or material that is not generally known by the public and that (i) is generated in, collected by, or utilized in Hub's operations and relates to the actual or anticipated business, research, or development of Hub, or (ii) is suggested by, or results from, any task assigned to Employee by Hub or any work performed by Employee for or on behalf of Hub, in all cases whether existing in hard copy, electronic format, or in Employee's mind or in any derivations, copy, or notes made from any item embodying Confidential Information. Confidential Information also includes all information received by Hub under an obligation of confidentiality to a third party, including, without limitation, Hub's customers, carriers, and other business relationships. Examples of Confidential Information include, but are not limited to, customer and carrier lists, information, and contacts; the identity of suppliers, including contacts, cost, capacity and products and services; financial data, pricing strategies, sales, costs, pricing, margins, load data, lane volumes; compensation and workforce information and strategies; customer plans and strategies; business plans and strategies; regulatory strategies; marketing and sales plans, programs, processes, and practices; information technology, technical know-how, formulae, processes, designs, prototypes, models, software, solutions, research and development; personnel information; competitor information; and any other information that Employee obtains from Hub that could reasonably be expected to be deleterious to Hub if disclosed to third parties.  The foregoing list is not exhaustive and Confidential Information also includes other information that would otherwise appear to a reasonable person to be confidential or proprietary in the context in which the information is known or used.

(b)                     "Competing Business" means any person (including Employee), company, or entity engaged in, or about to become engaged in, the business conducted by Hub on the date Employee's employment with Hub ends or any business Hub is actively considering or was considering at any time during the one (1) year period preceding the date of the end of Employee's employment with Hub, including, without limitation:

(i)     providers of intermodal, less-than-truckload, truckload, last mile, or other motor carrier freight transportation services;

(ii)     providers of warehousing and freight consolidation services;

(iii)     providers of third-party logistics services, including, without limitation, freight brokerage, freight forwarding, expediting, internet load boards, last-mile delivery logistics, contract logistics providers or firms;

(iv)      providers of parcel and parcel management services;

(v)     entities that engage in or may engage in acquisitions, mergers, and acquisition activities related to the transportation or third-party logistics industry, including, without limitation, researching, analyzing, and evaluating companies for possible investment in or acquisition of, for itself or clients; and

(vi)    Other individuals or businesses that otherwise compete with Hub anywhere in the Restricted Territory.

(c)     "Competing Services" means products, processes, or services of any person or organization other than Hub, in existence or under development, that are substantially the same as, may be substituted for, or applied to substantially the same end use as, the products, processes, or services with which Employee worked at any time during the last three (3) years of Employee's employment with Hub or about which Employee possessed Confidential Information through Employee's work with Hub.

(d)     "Government Agency" means any federal, state, local, or foreign government agency or commission.

(e)     "Inventions" means: (i) any inventions, developments, improvements, trade secrets, Confidential Information, ideas, or original works of authorship that Employee conceives, creates, develops, discovers, makes, acquires, or reduces to practice, in whole or in part, either solely or jointly with another or others, during or pursuant to the course of Employee's employment with Hub and that relate to Hub, its business, Competing Services, or to Hub's actual or demonstrably anticipated research or development; (ii) any inventions, developments, improvements, trade secrets, ideas, or original works of authorship that Employee conceives, creates, develops, discovers, makes, acquires, or reduces to practice, in whole or in part, either solely or jointly with another or others, during or pursuant to the course of Employee's employment with Hub and that are made through the use of any Hub equipment, facilities, supplies, trade secrets, or time, or that result from any work performed for Hub; and (iii) any part or aspect of any of the foregoing, in each case regardless of whether patentable or otherwise protectable under the law of any jurisdiction. For clarity, "Inventions" is not limited to the meaning of "invention" under the United States patent laws.

(f)     "Protected Contact" means any person, company, carrier, or entity that: (i) is a customer or supplier of Hub or with which Hub is involved in any business arrangement or has engaged in discussions regarding the possibility of entering a business arrangement; and (ii) (x) with whom or which Employee had contact or dealings on behalf of Hub, (y) for whom or which Employee had any direct or indirect responsibility on behalf of Hub, or (z) about whom or which Employee had access to or possessed Confidential Information, in each case at any time during the last three (3) years of Employee's employment with Hub.

(g)     "Regulatory Organization" means any independent financial regulatory organization.

(h)     "Restricted Territory" means any geographic area in which Hub conducts business or provides products or services, including the contiguous United States.

2.     **Acknowledgments**.  Employee acknowledges that Hub has invested extraordinary resources in the development of protectable business interests (including Confidential Information), relationships with Hub employees, customers, and suppliers, and highly valuable goodwill. Employee also acknowledges that: (a) Hub takes significant steps to preserve and to protect its Confidential Information and other protectable business interests; (b) these protectable business interests are critical to Hub's competitive advantage and ability to operate; (c) during the course of Employee's employment with Hub, Employee has been and/or will continue to be employed by Hub in a position in which Employee will learn and have access and exposure to Hub's Confidential Information and other protectable business interests; (d) the products and services that Hub develops, provides, and markets, and the information surrounding those products and services, are unique and confidential to Hub; (e) Hub's Confidential Information and other protectable business interests will retain continuing vitality throughout and beyond Employee's employment with Hub; (f) if Employee were to leave Hub and perform services for a Competing Business in a manner proscribed by this Agreement, it is highly likely, if not inevitable, that Employee would rely upon Hub's Confidential Information or other protectable business interests in the course of Employee's work, either consciously or subconsciously; (g) any diminution

of Hub's competitive advantage caused by Employee engaging in the activities proscribed by this Agreement would have severe and irreparable repercussions on Hub's business; (h) Employee's execution of this Agreement is an important and reasonable way for Hub to protect its Confidential Information and other protectable business interests; (i) the scope and duration of the restrictions and limitations described in Sections 3, 4, 5, and 6 of this Agreement are reasonable and necessary to protect the legitimate business interests of Hub; and (j) in light of Employee's experience, general knowledge, and skill, Employee's compliance with this Agreement will not prevent Employee from earning a living following the termination of Employee's employment with Hub. Accordingly, Employee acknowledges and agrees that this Agreement is necessary to safeguard Hub's Confidential Information and other protectable business interests and Employee's compliance with this Agreement does not and will not impose undue hardship on Employee.

3.    **Confidentiality; Inventions; Return of Information and Other Property**.

(a)    **Protection of Confidential Information**.    During and after Employee's employment with Hub, Employee will keep all Confidential Information in strict confidence and will not disclose it without Hub's prior written permission. During Employee's employment, Employee will use and disclose Confidential Information solely as necessary for the faithful performance of Employee's duties as a Hub employee and not for Employee's own benefit or for the benefit of any third parties; provided, however, that such permitted disclosures necessary for the performance of Employee's duties in the course of Employee's employment with Hub shall be made only to individuals within Hub who have a need to know such information or, in the case of Confidential Information that belongs to a third party, only to those individuals within Hub or the third party who have a need to know.   Employee will not use or disclose Confidential Information after the end of Employee's employment with Hub; provided, however, to the extent Confidential Information does not rise to the level of a trade secret, Employee shall not use, disclose, or share such Confidential Information or data for the time during which it remains confidential, or five (5) years after the end of Employee's employment with Hub, whichever time period is shorter.   Prohibited disclosures under this Section 3 include, without limitation, emailing or otherwise transmitting Confidential Information to Employee's personal email account, the personal email account of any Hub employee, or the personal or work email account of any non-Hub employee; downloading or uploading Confidential Information to any external media storage device or Cloud-based repositories without prior authorization; or copying, printing, retaining, disclosing, or removing, or attempting to copy, print, retain, disclose, or remove, any Confidential Information that Employee is not otherwise authorized to possess or disclose. These restrictions concerning use and disclosure of Confidential Information shall not apply to information that is or becomes publicly known by lawful means or comes into Employee's possession from sources not under an obligation of confidentiality to Hub. The restrictions set forth in this Section 3 are in addition to, and not in lieu of, any obligations Employee may owe under federal or state law.

(b)    **Notice of Immunity under the Defend Trade Secrets Act**. Employee acknowledges and agrees that Hub has provided Employee with written notice below that the Defend Trade Secrets Act, 18 U.S.C. § 1833(b), provides an immunity for the disclosure of a trade secret to report a suspected violation of law and/or in an anti-retaliation lawsuit, as follows:

(1)    IMMUNITY — An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that—

(A)    is made —

(i)    in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and

(ii)    solely for the purpose of reporting or investigating a suspected violation of law; or

(B)    is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

(2)    USE OF TRADE SECRET INFORMATION IN ANTI-RETALIATION LAWSUIT — An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may

disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual—

(A)    Files any document containing the trade secret under seal; and

(B)    Does not disclose the trade secret, except pursuant to court order.

(c)    **Ownership of Inventions**. Employee agrees that Hub owns the sole and exclusive right, title, and interest in and to any and all Inventions, including without limitation any and all intellectual property and rights in those Inventions, including, without limitation all inventions, patents, copyrights, mask works, design rights, database rights, trademarks, service marks, internet rights/domain names, slogans, trade secrets, know-how, ideas, concepts, and other proprietary rights (whether registered or unregistered and including any applications or rights to apply) subsisting anywhere in the world in any and all media now existing or hereafter created. Hub's right, title, and interest in and to the Inventions includes, without limitation, the sole and exclusive right to secure and own copyrights and maintain renewals throughout the world and the right to modify and create derivative works of or from the Inventions without any payment of any kind to Employee.

(d)    **Assignment and Disclosure of Inventions**. Employee will promptly and fully disclose all Inventions to Hub's management, and Employee will assist Hub to obtain and enforce the intellectual property protection for all Inventions anywhere in the world. To the extent legal title to any such Inventions does not automatically vest in Hub under applicable law, Employee hereby irrevocably assigns (and agrees to assign in the future) to Hub and its successors and assigns all worldwide right, title, and interest in and to such Inventions and all patent, copyright, trademark, and other intellectual property rights therein. During and after Employee's employment with Hub, Employee will, on request of Hub, execute specific assignments in favor of Hub or its nominee of Employee's interest in and to any of the Inventions covered by this Agreement and will execute all papers, render all assistance, and perform all lawful acts that Hub considers necessary or advisable for the preparation, filing, prosecution, issuance, procurement, maintenance, or enforcement of trademark registrations, copyright applications, patent applications, and patents of the United States and foreign countries for these Inventions or for the transfer of any interest that Employee may have. Employee will execute any and all papers and documents required to perfect, confirm, memorialize, or prove Hub's ownership of the Inventions, trademark registrations, copyright applications, patent applications, and interests, and will provide testimony and other assistance that Hub may reasonably request to obtain such protection. Employee further understands that the absence of a request by Hub for information, or for the making of an oath, or for the execution of any document, shall in no way be construed to constitute a waiver of Hub's rights under this Agreement. Employee hereby grants Hub a power of attorney to effectuate this Agreement in the event Employee is unable or unwilling in the future to perform the acts required by this Section 3(d).

(e)    **Works Made for Hire**. Employee agrees that all original works of authorship that are made by Employee (solely or jointly with others) within the scope of and during the period of Employee's employment with Hub and that are protectable by copyright shall be, to the extent permitted by law, "works made for hire" (as that term is defined in the copyright laws of the United States) and not works of joint ownership, and the authorship and copyright of the work shall be in Hub's name. To the extent that such writings and works are not works for hire, Employee agrees to irrevocably and unconditionally waive any "moral rights" that Employee may have in such writings and works and to assign to Hub all of Employee's rights, titles, and interests in and to such writings and works, including copyright.

(f)    **Exclusions**.  Notwithstanding the foregoing, any right of Hub or assignment by Employee as provided in Sections 3(c), 3(d), and 3(e) shall not apply to any Inventions for which no equipment, supplies, facility, or trade secret information of Hub was used and that were developed entirely on Employee's own time, unless (i) the Invention relates (x) to the business or business activities of Hub or to Competing Services, or (y) to Hub's actual or demonstrably anticipated research or development; or (ii) the invention results from any work performed by Employee for Hub.

(g)    **Disclosure of Previous Inventions**. Employee has disclosed to Hub all continuing obligations which Employee has with respect to the assignment of Inventions to any previous employer, and Employee claims no previous unpatented Inventions as Employee's own, except for those that have been reduced to practice and are shown on a schedule, if any, attached to this Agreement.  Employee understands and agrees

that any disclosure(s) in any attachment(s) hereto is not accepted by Hub and is not binding until it is reviewed and approved in writing by a Hub representative.

(h) **Return of Property and Copying**. Employee agrees that all tangible materials (whether existing on paper, stored electronically or existing in any other medium, and whether original or copies), including, but not limited to, Confidential Information, all documents, electronic communications, information stored electronically on a computer, computer printouts, electronic devices provided by Hub to Employee, computer software, storage devices, drawings, notebooks, reports, proposals, list of actual or potential customers or suppliers, formulae, prototypes, tools, equipment, models, specifications, methodologies, blueprints, financial data, contracts, agreements, correspondence, memoranda, and notes, in Employee's possession or control that in any way relate to Hub's business and are furnished to Employee by Hub or that are prepared, compiled, or acquired by Employee while employed by Hub shall be the sole property of Hub. Employee will at any time upon the request of Hub, and in any event promptly upon termination of Employee's employment, deliver all such materials to Hub and will not retain any originals or copies of such materials. Employee agrees not to copy or remove from Hub's place of business property or information belonging to Hub or entrusted to Hub or provide any such materials to any competitor of Hub without the express written consent of Hub. Further, except as provided for in Hub's Records Retention Policy, Employee agrees not to take any steps to delete, destroy, or take any other actions that would cause Hub's property (including, but not limited to, any electronic device provided by Hub to Employee) to be deleted, destroyed, or otherwise wiped or obfuscated at any time.

4. **Covenant Not to Compete**. During Employee's employment with Hub and for a period of one (1) year after the end of Employee's employment with Hub, Employee will not, in the Restricted Territory, directly or indirectly, manage, be employed by, or otherwise render services (whether as an employee, agent, partner, independent contractor, advisor or consultant) to any Competing Business: (a) in a capacity relating to the provision, management, development, manufacture, marketing, sales, or operation of any Competing Services; (b) in a position with responsibilities similar to those Employee had with Hub at any time during the three (3) years preceding the end of Employee's employment with Hub, or (c) in a capacity in which Employee could disclose or use Confidential Information. During Employee's employment with Hub and for a period of one (1) year after the end of Employee's employment with Hub, Employee will not directly or indirectly have any ownership or equity interest in any Competing Business, except that Employee may own not more than two (2) percent of the total shares of all classes of stock outstanding of any publicly held Competing Business. Employee agrees that if Employee violates any of the terms of this Section 4, the period of non-competition shall be extended by a period equal to that period beginning when the activities constituting such violation commenced and ending when the activities constituting such violation terminated. If Employee primarily resided or worked in California at the end of Employee's employment with Hub, the restrictions on Employee's activities contained in this Section 4 shall continue to apply to Employee after the end of Employee's employment with Hub only to the extent: (a) Employee carries out the prohibited activities outside of California; or (b) Employee uses trade secrets of Hub to carry out the prohibited activities within California.

5. **Non-Solicitation of Protected Contacts**. During Employee's employment with Hub and for a period of one (1) year after the end of Employee's employment with Hub, Employee will not, directly or indirectly, whether on Employee's own behalf or on behalf of any other entity (whether as an employee, consultant, contractor, advisor, director, or otherwise), solicit, divert, or encourage (or attempt to solicit, divert, or encourage) any Protected Contact: (a) to provide, or assist in providing, any Competing Services; (b) to become a customer, supplier or business relationship of any Competing Business; (c) to engage or retain a Competing Business to provide or perform any Competing Services; (d) to discontinue, reduce, not conduct, or not engage in business, in whole or in part, with Hub; or (e) to otherwise impede or interfere with the relationship and/or agreement between Hub and any such Protected Contact. Employee agrees that if Employee violates this Section 5, the period of non-solicitation shall be extended by a period equal to that period beginning when the activities constituting such violation commenced and ending when the activities constituting such violation terminated. If Employee primarily resided or worked in California at the end of Employee's employment with Hub, the restrictions on Employee's activities contained in this Section 5 shall continue to apply to Employee after the end of Employee's employment with Hub only to the extent: (a) Employee carries out the prohibited activities outside of California; or (b) Employee uses trade secrets of Hub to carry out the prohibited activities within California.

6. **Non-Solicitation of Employees and Contractors**. During Employee's employment with Hub and for a period of one (1) year after the end of Employee's employment with Hub, Employee will not, directly or indirectly, whether on Employee's own behalf or on behalf of any other entity (whether as an employee, consultant, contractor, advisor, director, or otherwise): (a) hire, solicit, or encourage (or attempt to hire, solicit, or encourage) any individual who was an employee, contractor, or consultant of Hub within the six (6) months preceding the termination of Employee's employment with Hub, to terminate, limit, or reduce any employment or contractual relationship with Hub; or (b) disclose employment-related or relationship-related information about Hub employees, contractors, or consultants to any other individual or entity; or (c) otherwise interfere with the performance by current or former Hub employees, contractors, or consultants of their obligations or responsibilities to Hub. Employee agrees that if Employee violates this Section 6, the period of non-solicitation shall be extended by a period equal to that period beginning when the activities constituting such violation commenced and ending when the activities constituting such violation terminated. If Employee primarily resided or worked in California at the end of Employee's employment with Hub, the restrictions on Employee's activities contained in this Section 6 shall continue to apply to Employee after the end of Employee's employment with Hub only to the extent: (a) Employee carries out the prohibited activities outside of California; or (b) Employee uses trade secrets of Hub to carry out the prohibited activities within California. Nothing in this Section 6 restricts Employee from exercising rights protected under the National Labor Relations Act.

7. **Notice and Disclosures to Future Employers**. Where possible, Employee will give fourteen (14) days written notice of intention to end Employee's employment with Hub to Employee's manager and to Hub Human Resources at HR_Notify@hubgroup.com. Following the end of Employee's employment with Hub, Employee hereby authorizes Hub to notify anyone employing Employee or evidencing an intent to employ Employee of the terms of this Agreement. To ensure Hub's rights and interests are protected and to mitigate the risk of future disputes, Employee also agrees, for a period of one (1) year following the termination of Employee's employment with Hub: (a) to disclose this Agreement to any prospective employer, business partner, or investor prior to accepting employment, entering a business relationship, or engaging in any business venture; and (b) prior to accepting any new employment or business relationship, to inform Hub Human Resources at HR_Notify@hubgroup.com of the identity of Employee's new employer or business relationship and of Employee's job title and responsibilities with such new employer or business relationship.

8. **Cooperation with Government Agencies and Regulatory Organizations; Protected Disclosures**. Notwithstanding anything in this Agreement, Employee may report any good faith allegation of possible violations of law or regulation to any Government Agency or to any Regulatory Organization; participate in any investigation or proceeding conducted by any Government Agency or Regulatory Organization; report any good faith allegation of criminal conduct to any federal, state, or local official; make other truthful statements or disclosures required by or protected under any law, regulation, or legal process; and request or receive confidential legal advice, in each case without prior notice to or authorization from Hub. Notwithstanding the foregoing, without Hub's prior authorization, Hub does not authorize Employee to disclose to any third party (including any government official or any attorney Employee may retain) any communication covered by Hub's attorney-client privilege.

9. **Representations**. Employee represents that Employee's performance of this Agreement and Employee's responsibilities as an employee of Hub will not breach any similar agreement with any former employer or other party. Employee understands that Hub does not seek any non-public proprietary or confidential information or trade secrets that Employee may have acquired from a previous employer. Employee agrees that Employee will not use or disclose any trade secrets or proprietary or confidential information from any former employer or third party during Employee's employment with Hub and that Employee will not bring onto the premises or into the electronic systems of Hub any non-public proprietary or confidential information or trade secrets belonging to any such employer or third party unless consented to in writing by such employer or third party. Employee also represents that Employee will not bring with Employee to Hub, or use during Employee's employment with Hub, any property of a former employer that would not generally be available to the public or has not been legally transferred to Hub. Employee will not use or incorporate any of Employee's pre-existing or independently created intellectual property with or into any Inventions. In the event Employee does so, Employee hereby grants Hub a non-exclusive, worldwide, fully-paid, royalty-free, irrevocable, perpetual, transferable, and sublicensable license to use such intellectual property in connection with such Invention(s).

10.    **Consequences of Breach of this Agreement**. In the event of a breach or threatened breach of this Agreement by Employee, Employee understands that Hub will face irreparable injury and that monetary damages may be difficult to calculate and/or inadequate to compensate Hub for the consequences resulting from an actual or threatened breach. As such, Hub shall be entitled, in addition to remedies otherwise available at law or in equity, to specific performance and/or immediate injunctive and/or other equitable relief, without the posting of a bond and without proof of damages. If Hub successfully enforces any portion of this Agreement in any legal proceeding, Hub shall be entitled to recover from Employee all of its reasonable attorneys' fees, witness fees, and costs, in addition to damages and equitable relief, incurred as a result of enforcing this Agreement against Employee.

11.    **Miscellaneous**.

(a)    **Choice of Law; Exclusive Forum; Consent to Jurisdiction**.

(i)    Employee and Hub agree that all issues and questions concerning the construction, validity, enforcement, and interpretation of this Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions that would cause the application of the laws of any jurisdiction other than the State of Delaware.

(ii)    Employee and Hub agree to submit to the exclusive jurisdiction of the state and federal courts of the State of Delaware for all matters arising out of or relating of this Agreement. Accordingly, Employee and Hub irrevocably and unconditionally submit and consent to the exclusive jurisdiction of these courts; consent to service of legal process as provided by Delaware law; and, to the fullest extent permitted by applicable law, waive any objection to personal jurisdiction or the laying of venue in these courts and waive any claim that these courts constitute an inconvenient forum. Employee and Hub further agree, to the fullest extent permitted by law, that a final and unappeasable judgment against them in any suit, action, or other proceeding contemplated herein shall be conclusive and may be enforced in any other jurisdiction within or outside the United States by suit on the judgment, a certified copy of which shall be conclusive evidence of the fact and amount of such judgment.

(iii)    Employee acknowledges and agrees that there is a substantial, material, and reasonable relationship between this Agreement and Delaware because, among other reasons, Hub is incorporated under Delaware law; this Agreement is governed by Delaware law; the parties submit to the exclusive jurisdiction of the state and federal courts located in Delaware for any and all matters arising out of or relating to this Agreement; Employee has had and/or will have access and exposure to Hub's Confidential Information and other protectable business interests throughout the Restricted Territory, including Delaware; and Employee's position and role at Hub impacts Hub's business throughout the Restricted Territory, including Delaware. Employee further acknowledges and agrees that because of the geographic breadth of Hub's business and its employees' activities, the selection of Delaware law and exclusive forum in Delaware courts promotes Hub's legitimate interest in the uniformity of the interpretation and application of this Agreement.

(iv)    Notwithstanding the foregoing, this Section 11(a) shall not apply to any Employee who primarily resides and works for Hub in California, except with respect to any claim or controversy between Employee and Hub arising outside of California (in which case this Section 11(a) shall apply).

(b)    **Binding Effect**. This Agreement and the obligations under this Agreement shall be binding upon Employee and Employee's successors, heirs, executors, and representatives.

(c)    **Assignability**. The rights and/or obligations herein may be assigned, in whole or in part, by Hub without Employee's prior written notice or consent, and shall bind and inure to the benefit of Hub's successors, assigns, and representatives. If Hub makes any assignment of the rights and/or obligations under this Agreement, Employee agrees that this Agreement shall remain binding upon Employee in any event. Employee understands that only Hub may, at any time and without further action by Employee, assign this Agreement to any of its affiliated companies with which Employee may be employed. In the event of such an assignment, the

assignee company shall succeed to all the rights held by Hub under this Agreement, and Employee's obligations under this Agreement shall remain in full force and effect.

(d)        **Severability and Reformation of Provisions**. The provisions of this Agreement are severable. Where allowed by applicable law, if a court of competent jurisdiction finds that one or more provisions is unreasonable in time or scope, is unlawful, or is otherwise unenforceable, the court shall enforce the provision to such lesser extent as it may be enforceable under applicable law and/or shall modify or reform the provision to make it enforceable. If such modification or reform is not possible, the unlawful or unenforceable provision will be severed from the Agreement and the remaining provisions will remain in full force and effect to the maximum extent allowed by applicable law.

(e)        **Acknowledgement of Obligations.** Employee acknowledges that Employee's obligations under this Agreement are in addition to any and all obligations concerning the same subject matter arising under any applicable law, including without limitation common law fiduciary duties and common law and statutory law relating to trade secrets.

(f)        **Waiver**. Any waiver of a default under this Agreement must be made in writing and shall not be a waiver of any other default concerning the same or any other provision of this Agreement. No delay or omission in the exercise of any right or remedy shall impair such right or remedy or be constructed as a waiver. A consent to or approval of any act shall not be deemed to waive or render unnecessary consent to or approval of any other or subsequent act.

(g)        **Entire Agreement; Amendments**. This Agreement contains the entire understanding between Hub and Employee with respect to the subject matter of this Agreement and there are no representations, promises, agreements or understandings, either written or oral, concerning such matters other than those contained in this Agreement.  No modification of or amendment to this Agreement will be effective unless in writing and signed by both Employee and an authorized officer of Hub.

(h)        **Counterparts.**  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, but all of which together will constitute one and the same Agreement.  Signatures delivered by scanned email or facsimile shall be deemed effective for all purposes.

(i)        **Headings**.  Section, paragraph and other captions or headings contained in this Agreement are inserted as a matter of convenience and for reference, and in no way define, limit, extend or otherwise describe the scope or intent of this Agreement or any provision hereof and shall not affect in any way the meaning or interpretation of this Agreement.

(j)        **Limitations of this Agreement**.  This Agreement is not a contract of employment for a specified period.  This Agreement does not alter Employee's status as an at-will employee and either Hub or the Employee may terminate Employee's employment for any reason at any time, subject only to Employee's compliance with the terms of this Agreement.  Employee's continued employment with Hub is expressly conditioned on Employee's good faith agreement to comply with this Agreement.

12.    **Informed Consent**. Employee acknowledges that: (a) Employee has carefully read and considered all of the Agreement and agrees that its terms are reasonable and necessary for the protection of Hub; (b) Employee is aware of Employee's right to consult an attorney and is advised to consult an attorney; and (c) Employee has had the opportunity to consult an attorney and has either done so or knowingly elected to forgo such counsel.

By your signature below you acknowledge that you have read and understand the foregoing Agreement, that you agree to comply with all the terms of the Agreement, and that you have received a copy of the Agreement. You also acknowledge that Hub has provided you with written notice above that the Defend Trade Secrets Act, 18 U.S.C. § 1833(b), provides immunity for the disclosure of a trade secret to report a suspected violation of law and/or in an anti-retaliation lawsuit.

**AGREED AND ACCEPTED:**

EMPLOYEE

Name: P_SIGNER_NAME

Date: P_SIGN_DATE

HUB GROUP, INC.

Name: _Michele McDermott_

Title: Chief Human Resources Officer

1